## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENARD PITNEY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 19-799 |
| | : | |
| CITY OF CHESTER, | : | |
| Defendant. | : | |

---

**Diamond, J.**                                                                 **May 20, 2020**

### MEMORANDUM

In 2012, the Supreme Court rejected a Fourth Amendment challenge to a jail policy requiring every arrestee—no matter how minor his charged offense—to submit to a strip search before entering the jail's general population.  Florence v. Board of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 322–23 (2012).  The Court left unresolved the question of whether such intrusive searches "would be reasonable in instances where . . . a detainee will be held without assignment to the general jail population and without substantial contact with other detainees."  Id. at 338–39 (plurality).   This case presents that question.  Plaintiff Kenard Pitney alleges that the City of Chester's Policy is unconstitutional because it requires police to strip search minor-offense arrestees, like Plaintiff himself, who will be held only briefly at the police station separate from other detainees.  Because I cannot conclude as a matter of law that the City's Policy comports with the Fourth Amendment, I will deny its Motion for Summary Judgment.

### I.      LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)  An issue is "genuine" if there is evidence

on which a reasonable fact finder could return a verdict for the nonmoving party.  Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the case's outcome under governing law.  Id. (citing Anderson, 477 U.S. at 248).  I must view the facts and draw all reasonable inferences in the opposing party's favor, although "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010); see Anderson, 477 U.S. at 255.

If the moving party satisfies this burden, the opposing party must then show a disputed material factual issue.  It is not enough simply to reiterate factual allegations or "show some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must establish a triable issue by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Finally, summary judgment is appropriate if the responding party fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

II.    FACTS

I have resolved factual disputes and construed the evidence in Plaintiff's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005);  (Doc. Nos. 19, 31.)  At summary judgment, "it is inappropriate . . . to . . . make credibility determinations." Big Apple BMW, Inc.

v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

On the evening of May 18, 2018, Plaintiff ate dinner and then drove to Harrah's Chester Casino, leaving his fiancée Quynh Tran at home with their two young children.  (Def.'s Statement of Undisputed Material Facts ¶¶ 1–2, Doc. No. 19.)  He asked a valet to park his car and walked into the Casino.  Over several hours, he consumed three or four drinks while playing video poker and slot machine games, losing $2,000.  (Id. ¶ 5; Deposition of Kenard Pitney, Ex. B to Def.'s SUMF, 47:12–48:1.)  Before leaving the Casino, Plaintiff called Ms. Tran, who testified that he did not sound intoxicated.  (Pl.'s Am. Statement of Additional Uncontested Facts ¶ 6.)

Plaintiff did not wish to drive home because, although he "didn't feel . . . intoxicated," he believed his blood alcohol level exceeded the legal limit.  (Pitney Dep. 53:9–19.)  He instead asked the valet to let him into his car so that he could retrieve personal items, including his house keys and valuables.  (Id. 56:7–20.)  The valet apparently summoned two Casino security guards, who believed Plaintiff was drunk, and told him to take a taxi or Uber home.  (Id. 60:1–61:15.)  Plaintiff told the guards he would ask a friend for a ride home, but again demanded access to his car to retrieve his belongings.  (Id. 60:24–61:15.)  The guards refused because they believed he was drunk and insisting on driving home.  A security supervisor intervened, also denying Plaintiff access to his car.  (Id. 66:16–67:14.)  At Plaintiff's request, the Casino security staff called the Chester Police Department, stating: "we have an intoxicated patron who is refusing to take a cab or an Uber to leave the property, and is trying to get into his vehicle."  (Police Radio Recordings, Ex. N. to Def.'s SUMF; Pitney Dep. 65:5–10.)

CPD Officers William Carey and William Murphy responded to the call.  Both officers testified that, given the strong odor of alcohol on Plaintiff's breath and his intemperate behavior, they believed he was intoxicated.  (Deposition of Sergeant William Carey 14:16–22, Ex. E to

Def.'s SUMF; Deposition of Officer William Murphy III 18:24–19:11, Ex. D to Def.'s SUMF.)

They engaged in the same "back-and-forth," encouraging Plaintiff to get a ride home.  (Pitney

Dep. 80:1–81:24; Carey Dep. 15:12–18 ("All I know is we were trying to get him help, to get him

a cab, to get him a ride, to get an Uber or something so he would not drink and drive in a vehicle.").)

Surveillance footage of Plaintiff's interactions with Casino security and the police does not suggest

that he was belligerent.  (Ex. 1 to Pl.'s Opp'n; see also Carey Dep. 53:21–22 ("Q.  Pitney was

never violent, right?  A.  No, he wasn't.").)

When Plaintiff continued to insist on access to his car, the officers arrested him for public

intoxication.  Wearing only shorts, sandals, and a t-shirt, Plaintiff was patted own for weapons and

driven to the Chester Police Headquarters in Delaware County, arriving at 10:05 p.m.  (Murphy

Dep. 35:13–23; Def.'s SUMF ¶ 42.)  The Headquarters is not a prison.  It is an administrative

facility with eight "holding cells."  (See Affidavit of Chief of Police James E. Nolan, IV ¶¶ 17–

33, Ex. K to Def.'s SUMF.)  Corporal Michael Maher testified that Plaintiff appeared intoxicated

and refused to provide biographical information.  (Deposition of Corporal Michael Maher 11:4–

12:4, Ex. F to Def.'s SUMF.)  Plaintiff was handcuffed to the turnkey bench during his processing.

(Id. ¶ 22.)   This is a "temporary spot" used for all arrestees, except "violent prisoners," who go

directly to the Station's holding cells. (Maher Dep. 17:14–18:1, 37:9–20; City of Chester Policy

Directive 69: Operational Guidelines for Turnkeys ¶ 10, Ex. J to Def.'s SUMF.)  Plaintiff remained

on the bench for about thirty minutes. (Maher Dep. 16:22–24; Turn Key Log Book and Prison

Property Receipt, Ex. G to Def.'s SUMF.)

Ordinarily, those detained at the Headquarters facility for more serious offenses are brought

before the local Magisterial District Judge for arraignment.  (See Chester Directive 69 ¶ 5.)

Someone arrested for a summary offense, however, is released once his citation is issued.  (Chester

Police Department, Directive No. 21: Intoxicated Persons in Police Custody at 2, Ex. H to Def.'s SUMF.)  As Plaintiff was intoxicated, the police would release him only to a relative or friend willing "to accept responsibility to escort him[] home."  (Id.)  Police thus contacted Ms. Tran, who said that she would need about an hour to get to the Station.  (Deposition of Quynh Tran 27:9–15, Ex. C to Def.'s SUMF.)  Because CPD has determined that keeping an arrestee on the bench indefinitely is dangerous, once it appeared that Plaintiff's release would not be immediate, he was moved to a holding cell.  (Maher Dep. 17:12–18:19.)

Pursuant to the City's Policy (which I set out below), Maher conducted a visual strip search and body cavity inspection of Plaintiff in the otherwise unoccupied cell: Maher stood outside the cell speaking to Plaintiff through the bars at a distance of two to three feet.  (Pitney Dep. 120:1–16.)  He first directed Plaintiff to remove and hand over each item of clothing, which Maher checked for contraband.  (Maher Dep. 27:15–18.)  Once Plaintiff was fully nude, Maher ordered him to grab and lift his testicles, and then "to turn around, bend over, cough, [and then] shake [his legs].  [Maher] then told [Plaintiff] to stand in front of him and shake."  (Pitney Dep. 118:23–119:18, 120:19–121:4.)  Up to that point, Plaintiff had followed Maher's commands.  Plaintiff refused, however, Maher's order "to go to the back of the wall and spread eagle" (i.e. spread his buttocks with his hands, squat, and cough).  (Id. 121:7–18.)  Maher then told Plaintiff to get dressed, leaving him in the cell.  Plaintiff testified that the strip search lasted five to ten minutes, during which Maher made derisive noises.  (Id. 122:19–22, 118:18–19.)

Plaintiff remained alone in the cell until he was cited for public intoxication and released to Ms. Tran approximately thirty minutes later, at 11:05 p.m.—about an hour after she spoke with police.  (Id. 122:23–14; Maher Dep. 22:5–7.)  He never had any contact with another arrestee.  Indeed, the Station had just one other arrestee at that time, leaving six holding cells empty.  (See

Turn Key Log Book and Prison Property Receipt; Maher Dep. 21:15–17.)  By midnight, all the holding cells were empty.  (See Turn Key Log Book and Prison Property Receipt at 3.)

### III.    STRIP SEARCH POLICIES

The Parties agree that Maher followed CPD's Directive 35, which instructs officers to "'strip search' . . . [a]ny person, male or female, who is charged by the Chester Police . . . with a violation of law which will require that person to be placed in a locked cell *or* having contact with others in custody."  (City of Chester Policy Directive 35: Search and Handling of All Persons in Custody, Ex. H to Def.'s SUMF (emphasis added).)  All cells are monitored by the use of video cameras.  (Pl.'s Resp. to Def.'s SUMF ¶ 57 (citing Maher Dep.).)  Under the City Policy, police must conduct a strip search of a person placed in a cell, regardless of whether there is reasonable suspicion to believe he has contraband.  (See id.)

"Generally, non-violent [i]ndividuals who are to be immediately released after booking and processing are not placed in a holding cell and are not strip searched."  (Affidavit of Chief of Police James E. Nolan ¶ 35, IV, Ex. K to Def.'s SUMF.)   An intoxicated arrestee may, however, be placed in a cell if there is no competent adult available to escort him home.  Once removed from the turnkey bench and placed in a cell, he must be strip searched, even if he is not to have any contact with other detainees.  At no point during the search may the officer touch the prisoner.  (Def.'s SUMF ¶ 39.)  The officer and prisoner must be of the same sex.  The Policy was designed to help CPD confiscate drugs, weapons, and other contraband (with which a prisoner could harm himself or others).  (Chester Directive 35.)

According to Chester's "expert," former New Britain Police Chief Joseph Stine, the City's Policy is necessary to "protect": arrestees, including those who might harm themselves; officers; and unarmed police personnel.  (Expert Opinion Report by Joseph Stine at 9, Ex. M to Def.'s

SUMF.)  That view is far from unanimous, however.  Although Plaintiff has not submitted an expert report, he offers examples of more restrictive search policies (which I discuss below).  Virtually all federal law enforcement agencies allow strip searches only in more limited circumstances.  The Bureau of Prisons, for example, authorizes inmate strip searches only "where there is a reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment has occurred."  (Federal Bureau of Prisons, Searches of Housing Units, Inmates, and Inmate Work Areas, at 4, Ex. 2 to Pl.'s Opp'n (codified at 28 C.F.R. § 552.11(c)).)  The United States Marshals Service follows a similar policy based on individualized suspicion, as do the police departments in cities such as Baltimore and Philadelphia: all prohibit strip searches of those arrested for summary offenses.   (See USMS Directive 9.1(E)(3)(a), Ex. 4 to Pl.'s Opp'n; Philadelphia Police Department Directive 5.7-22(A), Ex. 8 to Pl.'s Opp'n; Baltimore Police Department Policy 1013 at 2, Ex. 9 to Pl.'s Opp'n.)

## IV.   PROCEDURAL HISTORY

The instant Complaint was filed on February 25, 2019, and assigned to then–Judge Robert Kelly.  (Doc. No. 1.)  Plaintiff brought constitutional and state law claims against the City of Chester, Officer Murphy, and two unnamed Police Officers.  (Doc. No. 1.)  Although the public intoxication summons was eventually dismissed, Plaintiff withdrew his false arrest claims in the instant case.  The Parties stipulated to dismissal of the individual officer Defendants and various claims against CPD, leaving only Plaintiff's § 1983 *Monell* challenge to the City's strip search Policy.  (Doc. Nos. 6, 7.)

On October 3, 2019, Plaintiff sought leave to add class allegations.  (Doc. No. 14.)   The case was reassigned to me on October 11, 2019.  (Doc. No. 16.)  Two days later (before responding to Plaintiff's Motion for Leave to Amend), the City moved for summary judgment.  (Doc. No. 19.)

I granted the Parties' stipulation to defer my decision on Plaintiff's amendment request until I ruled on summary judgment.  (Doc. Nos. 23 & 24.)  The matter has been fully briefed.  (Doc. Nos. 14, 31, 32.)

## V.    DISCUSSION

Over forty years ago, the Supreme Court set out the circumstances in which a § 1983 constitutional tort claim may proceed against a municipality:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Monell v. N.Y. City Dep't of Soc. Svcs., 436 U.S. 658, 694 (1978).  Plaintiff thus charges that the City of Chester is liable under *Monell* because CPD violated his Fourth Amendment rights when it strip searched him pursuant to the City's Policy. In seeking summary judgment, the City argues that I can resolve Plaintiff's claim on the ground that there was no constitutional injury: there was reasonable suspicion to strip search Plaintiff.  I do not agree.  Because a jury could find that the search was unsupported by reasonable suspicion, I may not grant summary judgment on that ground.  Because I also may not conclude as a matter of law that Chester's Policy is permissible under *Florence* or otherwise complies with the Fourth Amendment, I will deny summary judgment as to Plaintiff's *Monell* claim.

### A.    Reasonable Suspicion

The City argues that, regardless of the constitutionality of its Policy, I should dismiss because its officers had reasonable suspicion to strip search Plaintiff for contraband or weapons. (Def.'s Mot. Summ. J. 23–25.)  Both Parties agree that police may strip search an arrestee based upon individualized, reasonable suspicion.  Sloley v. VanBramer, 945 F.3d 30, 37–38 (2d Cir. 2019); (see Def.'s Mot. Summ. J. 23–25; Pl.'s Opp'n 35.)  Since 2012, most court have ruled that

strip searches not otherwise permissible under *Florence* must be based on reasonable suspicion. Calloway v. Lokey, 948 F.3d 194, 202 (4th Cir. 2020) (strip searches of prison visitors must be premised on "reasonable suspicion, based on particularized and individualized information, that such a search will uncover contraband on the visitor's person on that occasion"); Sanchez v. County of Essex, 2016 WL 4577008, at *4 (D.N.J. Sept. 1, 2016) (applying reasonable suspicion standard to strip searches of arrestees held apart from general population); Holland v. City of San Francisco, 2013 WL 968295, at *7 (N.D. Cal. Mar. 12, 2013) (same). But see Lear v. Phoenixville Police Dep't, 2017 WL 1805964, at *7 (E.D. Pa. May 5, 2017) (applying probable cause standard); Gallagher v. Green, 2016 WL 3213346, at *8 (E.D. Pa. June 10, 2016) ("[T]he Third Circuit has never held that a search incident to arrest for a misdemeanor crime, when the arrestee will be released and not placed in an institutional setting, permits strip searches and body cavity searches based on a reasonable suspicion.").

The existence of reasonable suspicion is usually a jury question. See Christian v. Orr, 512 F. App'x 242, 246 (3d Cir. 2013). Courts have ruled as a matter of law, however, that police had reasonable suspicion to conduct a strip search. See, e.g., Keating v. Pittston City, 643 F. App'x 219, 224 (3d Cir. 2016). This is not such a case. Even viewing the evidence most favorably to the police, they had no "particularized and objective basis" justifying Plaintiff's strip search. United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). The Second Circuit has set out the applicable standard:

> The Fourth Amendment requires an individualized reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest before she may be lawfully subjected to a strip search.

Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (internal quotation marks and alterations omitted). The City thus urges that "reasonable suspicion may be based on such factors as the

nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." (Def.'s

Mot. 24 (quoting Alison v. CEO Group, 611 F. Supp. 2d 433, 452 (E.D. Pa. 2009)).)  There is no

evidence, however, suggesting that the officers thought Plaintiff had a record or was under the

influence of drugs.  See Hartline, 546 F.3d at 101; (Carey Dep. 27:7–16.)  Police arrested Plaintiff

because they believed he was drunk and refused to call a taxi, insisting on driving himself home.

As Plaintiff was wearing only shorts, a t-shirt, and sandals, his immediate pat down in the Casino

parking lot would have revealed weapons or dangerous objects.  (Murphy Dep. 35:13–23, 36:3–

7.)  Police testimony and the Casino video confirm that he was not violent or belligerent.  Sergeant

Carey could not explain how the police might have suspected that Plaintiff had weapons or drugs

on his person, testifying only that he "never assume[s]" anything of suspects.  (Carey Dep. 55:3–

4, 7–15, 23–24.)  Officer Maher added nothing to that "explanation":

> Q.  [W]hat I am asking is if you saw anything about him, you observed anything
> about him which gave you any particularized reasonable suspicion that he was
> carrying any kind of contraband?  A.  ***The only thing I knew about Mr. Pitney was
> that he was intoxicated***.

(Maher Dep. 29:24–30–4 (emphasis added)); see Calloway, 948 F.3d at 202 (reasonable suspicion

must be based on "particularized and individualized information").

 Although he was uncooperative at the Station, once again, he was not violent or

belligerent.  Had he been, the police would not have allowed him to remain on the turnkey bench

for thirty minutes.  (Cf. Def.'s Mot. Summ. J. 6 ("[T]wo of the eight attempted suicide examples

provided by the Chester Police involved suicide attempts carried out by people handcuffed to the

bench.").)  To the contrary, they would have immediately put him in a cell.  (Chester Directive 69

¶ X(C) ("V[iolent] prisoners will be placed directly in a cell and the Supervisor notified.").)

Minutes after Plaintiff arrived at the Station, Ms. Tran told the police she would be there

in an hour.  The officers also knew that there were seven vacant cells, so that Plaintiff would not

have to share a cell or have any contact with other detainees.  Finally, Officer Maher did nothing when Plaintiff refused to complete the strip search—declining "to go to the back of the wall and spread eagle." (Pitney Dep. 121:7–18.)

The totality of circumstances does not make out reasonable suspicion to strip search Plaintiff.  Indeed, Maher's decision not to complete the strip search suggests he did not think Plaintiff had secreted guns or drugs on his person.   Because a jury could thus certainly find the absence of reasonable suspicion, I will not grant summary judgment for Chester on this ground. Accordingly, I must address Plaintiff's *Monell* claim.

### B.      Strip Search Policy

The City concedes that Plaintiff was strip searched as required by its Policy, and that the search caused whatever injury Plaintiff suffered.  (Def.'s SUMF ¶ 40; Def.'s Mot. Summ. J. 3–4.) The City vigorously disputes, however, that any constitutional violation occurred.  Rather, the City argues that I should grant summary judgment because its Policy is permissible under *Florence*.  I do not agree.

In upholding a New Jersey prison's policy of strip searching all pre-trial detainees before their transfer to in the jail's population, the *Florence* Court explicitly acknowledged the limits of its ruling:

> This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees.

566 U.S. at 338–39 (plurality).  Mr. Florence was strip searched twice, both times upon entering county jails where he "shared a cell with at least one other person and interacted with other inmates following his admission to the jail."  Id. at 323.  The second county jail is the largest in New Jersey, admitting "more than 25,000 inmates each year and hous[ing] about 1,000 gang members at any

given time." Id.  The Supreme Court has long recognized that such prisons are "unique place[s]

fraught with serious security dangers." Bell v. Wolfish, 441 U.S. 520, 559 (1979).  Otherwise

unreasonable searches could thus be permissible in a prison because they are essential for

"maintaining institutional security and preserving internal order and discipline." Id. at 546.  In

upholding the New Jersey policy, the Supreme Court  emphasized that it was essential to prevent

the spread of weapons, currency, diseases, drugs, and the like from prisoner to prisoner:

> There is a substantial interest in preventing any new inmate, either of his own will
> or as a result of coercion, from putting all who live or work at these institutions at
> even greater risk when he is admitted to the general population.

 Florence, 566 U.S. at 333; see id. at 326; id. at 335 ("A detainee might risk carrying cash,

cigarettes, or a penknife to survive in jail.").

Although Chief Justice Roberts and Justice Alito both joined the majority opinion, each

wrote separately to emphasize the narrowness of the Court's ruling.  Justice Alito thus cautioned

that it might be impermissible to strip search an arrestee "whose detention has not been reviewed

by a judicial officer and who could be held in available facilities apart from the general

population." Id. at 341 (Alito, J., concurring); see also id. at 342–43 (Breyer, J., dissenting) ("The

case is limited to strip searches of those arrestees entering a jail's general population.").

Not surprisingly, courts applying Florence have consistently ruled that critical to its

holding was the detainee's placement in the prison's general population, which triggered the

security concerns that comprised the bulk of the Court's analysis.  See, e.g., Fonder v. Sherriff of

Kankakee Cty., 823 F.3d 1144, 1147 (7th Cir. 2016); Cantley v. W.V. Reg'l Jail & Corr. Facility

Auth., 771 F.3d 201, 208 (4th 2014) ("Florence made clear that blanket strip searches prior to

arraignment of arrestees not designated for assignment to the detention facility's general

population are constitutionally suspect in the absence of some particularized justification.");

<u>Sanchez</u>, 2016 WL 4577008, at *4–5; <u>Holland</u>, 2013 WL 968295, at *8 (summary judgment inappropriate where "Defendants could have—and in fact did—hold [Plaintiff] apart from the jail's general population").

Indeed, even the decisions on which Defendant relies turn on the critical fact that the arrestees "were *actually* placed in the general population" of jails for days.  <u>Bizzarro v. Ocean County</u>, 2017 WL 2119450, at *10 (D.N.J. May 16, 2017) (emphasis added); <u>see id.</u> at *13 (Arrestees "could not have been held in facilities apart from the general population based on overcrowding."); <u>Moore v. Atlantic County</u>, 2015 WL 1268184, at *3 (D.N.J. Mar. 18, 2015) ("[I]t would have been a practical and physical impossibility for [the jail] to have housed each incoming non-indictable detained, alone in an individual cell, apart from the general population, from admission until such time as that detainee was seen by a judge or judicial offer.") (internal quotation marks omitted); <u>see also</u> <u>Collazo v. County of Lancaster</u>, 2012 WL 3777440, at * 6 (E.D. Pa. Aug. 31, 2012) (*Florence* governs because "[p]laintiff provides no evidence regarding the availability of alternative facilities removed from Lancaster County Prison's general population").

This wealth of authority confirms that the City is incorrect in urging that its Policy is permissible under *Florence*.  To the contrary, the Policy differs materially from that upheld by the Supreme Court.  See <u>Fonder</u>, 823 F.3d at 1147; <u>Cantley</u>, 771 F.3d at 208; <u>Sanchez</u>, 2016 WL 4577008, at *4–5; <u>Phillips v. Sheridan Cty. Sheriff's Office</u>, 2015 WL 13689047, at *11 (D. Wyo. May 4, 2015) ("[T]he appropriate consideration for purposes of *Florence* is whether the pretrial detainee is *actually admitted* to the general jail population.") (emphasis added);  <u>Holland</u>, 2013 WL 968295, at * 8 (N.D. Cal. Mar. 12, 2013).

The City also apparently contends that its Policy otherwise complies with the Fourth Amendment.  Again, I disagree.  As the Supreme Court has ruled, I must determine whether the

Policy is "reasonably related to legitimate penological interests." <u>Blaisure v. Susquehanna County</u>, 621 F. App'x 145, 146 (3d Cir. 2015) (quoting <u>Florence</u>, 566 U.S. at 326).  I shall thus "balance[e] . . . the need for the particular search against the invasion of personal rights that the search entails," with full consideration given to "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." <u>Bell</u>, 441 U.S. at 559; <u>see also</u> <u>Turner v. Safley</u>, 482 U.S. 78, 90 (1987).

The balance tips against the City's stated justification for its Policy.  The Chester Police Headquarters is not a prison, but an administrative facility with eight "holding" cells.  <u>See</u> <u>Chapolini v. Capodanno</u>, 2019 WL 4242508, at *12 (E.D. Pa. Sept. 5, 2019) (principles discussed in <i>Florence</i> inapposite to police station strip search); <u>Fate v. Charles</u>, 24 F. Supp. 3d 337, 346 (S.D.N.Y. June 5, 2014) ("An ordinary misdemeanor arrest is not sufficient for these purposes. Instead, to justify strip searching a misdemeanor arrestee at a police station, an officer must have reason to suspect that the specific arrestee is concealing weapons or other contraband.").  The City has submitted the affidavit of CPD Chief Nolan who apparently has no firsthand familiarity with this matter.   Rather, he discusses only hypothetical difficulties that might arise at CPD Headquarters.  For instance, he avers that "an arrestee initially placed in a holding cell alone may not remain alone. Depending on the influx of other arrestees, other arrestees may be placed in a holding cell with the arrestee in question."  (Nolan Aff. ¶¶ 30–31.)  Yet, the affidavit of Nolan (who has been a Chester Police Officer for almost 25 years) includes no supporting facts, leaving unanswered: how often any of the eight holding cells holds more than one prisoner; how often all eight cells have been occupied; why a non-violent, summary offense prisoner (like Plaintiff) could not be held alone for a brief period, especially when six other cells were empty.  Nor, in discussing the dangers that might arise when a prisoner is alone in a cell, does Nolan even acknowledge that

the prisoner would be under video surveillance throughout.  (See id. ¶ 24.)  Finally, as I discuss below, it appears that arrestees are kept only briefly at Headquarters, distinguishing it from facilities that hold large numbers of pre-trial detainees for extended periods.  See Bell, 441 U.S. at 555.

To make out the "legitimate penological interests" supporting its Policy, the City also offers Chief Stine's "expert" report.  Stine's experience is exclusively in police work and "criminal justice."  (Stine Rep. 1.)  Indeed, a considerable part of Stine's report is comprised of his legal opinions.  (See, e.g., id. at 8–9.)  Stine served as a Philadelphia Police Officer from 1966 to 1990, attaining the rank of Inspector.  From 1990 to 2000, he was the Chief of Police of New Britain Township in Bucks County.  Although Stine's professional activities over the last twenty years are unclear, he appears to have started a "consulting" firm in 1999, which he still heads.   He reports no training or experience in penology and has never worked in a prison.  Indeed, he has never worked in the City of Chester or Delaware County.  Because Plaintiff has not raised a *Daubert* challenge, however, I will consider his "expert" report, bearing in mind the Seventh Circuit's observation that such "testimony about police department policies and standards of police practice [is] irrelevant to determining what is objectively reasonable under the Fourth Amendment."  Legg v. Pappas, 383 F. App'x 547, 550 (7th Cir. 2010).

Stine offers his opinion that the CPD policy "is in accord with generally accepted practices and procedures for professional law enforcement agencies."  (Stine Rep. 10.)  Yet, he provides no supporting authority.  See In re Puda Coal Secs. Inc., Litig., 30 F. Supp. 3d 230, 250 (S.D.N.Y. 2014) ("[E]ven otherwise qualified experts may not simply offer conclusory opinions.").  Contrary authority abounds, however.  See Am. Correctional Ass'n, Core Jail Standards § 1–CORE–2C–02, pp. 20 (2014); (BOP, Searches of Housing Units Inmates, and Inmate Work Areas, at 4; USMS

Directive 9.1(E)(3)(a); U.S. Immigration & Customs Enforcement 2011 Operations Manual, Section 2.10 Searches of Detainees ¶¶ 7–8, Ex. 6 to Pl.'s Opp'n; Detroit Police Dep't Directive 202.2 - 13.1–13.2; Federal Performance Based Detention Standards § C3.3 (Nov. 2017), Ex. 5 to Pl.'s Opp'n.)  Indeed, as I have discussed, Chester's Policy is contrary to the search policy in Philadelphia, where Stine spent most of his career.  (See PPD Directive 5.7-22(A).)  The International Association of Chiefs of Police, of which Stine is a "Life Member," also recommends against strip searching minor, nonviolent offenders "unless the arresting officer has articulable reasonable suspicion to believe that the individual is concealing contraband of weapons."  (Int'l Ass'n of Chiefs of Police, Strip and Body Cavity Searches § IV(A)(2) (Sept. 2019), Ex. 7 to Pl.'s Opp'n.)

Stine notes that CPD incident reports show that detainees were found to have secreted contraband and weapons on their persons.  The heavily redacted descriptions are less than clear, however.  For instance, it appears that many of the items were recovered during less intrusive searches or pat-downs.  (See generally CPD Incident Reports, Ex. L to Def.'s SUMF.)  Moreover, I often cannot determine the offenses with which all the prisoners were charged.

Chief Stine repeatedly invokes the need for security and safety.  He does not, however, adequately explain how these penological interests—which surely are legitimate—are served by the City's Policy.  Indeed, Plaintiff's search underscores that the Policy has, at best, a tenuous relationship with those interests.  Plaintiff, who was lightly clad, had been patted down at the Casino and was determined to have no weapons or dangerous implements.  He spent half an hour cuffed to the turnkey bench—a practice CPD believes could create a danger to inmates and staff alike—without incident.  The CPD knew that Plaintiff's fiancée said she would arrive in an hour to drive Plaintiff home.  Only one holding cell was occupied at the time Plaintiff was placed in a

second; by midnight (90 minutes after Plaintiff was strip searched), even that cell was empty.  (See Turn Key Log Book and Prison Property Receipt.)  Police thus could (and did) keep Plaintiff alone during his brief stay.  The officer who conducted the strip search acknowledges that he did not complete the search.  While in the cell, Plaintiff was under continuous video surveillance.

On the other side of the balance is Plaintiff's "especially high . . . privacy interest" in his "naked body" and "body cavities."  Fate, 24 F. Supp. 3d at 345 & n.6 (collecting cases); see Florence, 566 U.S. at 341 (Alito, J., concurring) ("Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many.").

In these circumstances, the need for CPD's Policy is not as evident as its potential for abuse.  It is apparent that the intrusive, demeaning strip search of Plaintiff did little to promote institutional security.  When a non-drug summary offender has been patted down, uncovering no contraband, is neither violent nor belligerent, and will be held briefly and alone in a cell, strip searching him is unreasonable.

I will not dismiss Plaintiff's *Monell* claim because I cannot conclude that the CPD Policy comports with the Fourth Amendment.

## VI.    CONCLUSION

*Florence* admonished that "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."  Florence, 566 U.S. at 322–23.  But see Stoudemire v. Mich. Dep't of Corrections, 705 F.3d 560, 572 (6th Cir. 2013) ("[W]e must not confuse deference with abdication .").   Plaintiff has made such a showing.  I am acutely aware of CPD's need to maintain a safe holding facility.  Yet, CPD here seeks virtually unlimited authority to strip search all its arrestee. As the innumerable law enforcement agencies have concluded,

however, the need for safety can be met fully with less extreme methods.

It is undisputed that in strip searching Plaintiff, CPD closely followed the City's published Policy.  Because I cannot conclude as a matter of law that the Policy is permissible under *Florence* or comports with the Fourth Amendment, I will deny Defendant's Motion for Summary Judgment.

An appropriate Order follows.


*/s/ Paul S. Diamond*
_____
May 20, 2020                                          Paul S. Diamond, J.